**C. T. MARTIN et al., Appellants,**

**v.**

**Fred SNUGGS et al., Appellees.**

No. 15832.

Court of Civil Appeals of Texas.

Fort Worth.

May 17, 1957.

Rehearing Denied June 14, 1957.

Brown & Verity, Oklahoma City, Okl., Sullivant & West, Gainesville, Bullington, Humphrey, Humphrey & Fillmore and Leslie Humphrey, Wichita. Falls, for appellants.

Cecil Murphy, Gainesville, H. M. Bateman, Kilgore & Kilgore and John E. Kilgore, Dallas, for appellees.

RENFRO, Justice.

This is a suit in trespass to try title and, in the alternative, for reformation of a deed.

On September 27, 1943, Frost was record owner of the fee-simple title to the land involved. He held the land, however, for the benefit of the General Convention of the New Jerusalem in the United States of America, a corporation. On the above date, Frost executed a special warranty deed to Martin, which, after the metes and bounds description, contained the following: "Save and except, however, unto the Grantor, his heirs and assigns, an undivided one-half interest in and to all oil and mineral rights in and under the land described herein. It is agreed, however, that the Grantor shall not participate in the cash bonus or cash rentals paid for drilling or delay payments."

On December 14, 1953, Martin executed a five-year primary term oil and gas lease to Ramsey. This lease was assigned to Ashland Oil & Refining Company on January 30, 1954. On September 7, 1955, Snuggs acquired title to one-half of the mineral interest reserved by the Convention in the heretofore mentioned special warranty deed. On November 3, 1955, Martin and Ashland brought suit against Snuggs and the General Convention in which they sought a decree establishing that the undivided one-fourth mineral interest of each the Convention and Snuggs was a nonparticipating mineral interest without any leasing and/or executory rights entitled to receive an undivided one-fourth of one-eighth of any oil, gas or other hydrocarbons produced, but not entitled to drill or take oil therefrom and not entitled to execute an oil and gas lease thereon; and, in the alternative, prayed that the court reform the deed of September 27, 1943, to express the true intent of the parties and to reserve to the grantor only an undivided one-half nonparticipating mineral interest without any leasing and/or executory rights and without the right to enter or drill.

On November 3, 1955, the plaintiffs filed their lis pendens giving notice of the suit. On December 15, 1955, Snuggs acquired the remaining interest of the Convention and thereafter the Convention filed a disclaimer. On December 21, 1955, Snuggs conveyed one-half of the interest he had acquired from the Convention to Cox and Cox was made a defendant in the suit.

Issues were submitted to the jury on the alternative count and answered favorably to the plaintiffs.

On motion of the defendants, judgment was entered non obstante veredicto for said defendants.

Martin and Ashland have appealed on two points of error. First, that the deed from Frost to Martin granted Martin the exclusive executive right to execute oil, gas and mining leases on the usual seven-eighths working interest in the oil, gas and minerals in, on and under said land. Second, if the deed did not by its express terms grant the exclusive leasing rights to C. T. Martin, then such failure was the result of a mutual mistake between the parties and such deed should be reformed to conform to the agreement and intention of the parties as shown by the undisputed evidence and verdict of the jury.

Plaintiffs, appellants in this appeal, quote extensively from Hudgins v. Lincoln National Life Insurance Co., 144 Fed.Supp. 192, in support of their first point of error. We have concluded, however, that the deed on its face does not grant Martin exclusive leasing rights. The reservation is an outright reservation of an undivided one-half interest in and to all oil and mineral rights in and under the land described. The only limitation placed on said reservation is that the grantor shall not participate in the cash bonus or cash rentals paid for drilling or delay rights.

In ascertaining the intention of the parties to a mineral deed, the question is not determined by the intention which the parties may have had but failed to express, but the intention which by the instrument they did express. First Nat. Bank of Snyder v. Evans, Tex.Civ.App., 169 S.W. 2d 754.

The intention of the parties when it can be ascertained from a consideration of all parts of the instrument will be given effect when possible, and that intention when ascertained prevails over arbitrary rules. Harris v. Windsor, Tex., 294 S.W. 2d 798.

Although, in Westbrook v. Ball, 222 Miss. 788, 77 So.2d 274, 275, the grantor expressly reserved the right to go upon the land, the court used this language: "The grantor in this deed not only retained the minerals, but retained the right to go upon, enter, to explore for, drill for, mine, store and remove all of said minerals at any and all times. All these rights are necessary to the execution of an oil, gas, and mineral

lease, and where minerals are reserved these rights are necessarily implied even though not specifically reserved. McNeese v. Renner, 197 Miss. 203, 21 So.2d 7. However, in this deed all were reserved. A royalty owner has none of these rights but only has the right to share in the minerals when produced. The owner of minerals has the right to execute oil, gas and mineral leases, selecting the lessee and fixing the terms of the lease, and to receive therefrom the bonuses, delay rentals and royalties. *All these rights are transferable and a grantor can transfer all of them, or only part of them, but in reserving the minerals, all are retained that are not specifically granted.* Appellee reserved the minerals and it was only specified that the bonuses and rentals from any lease executed would go to appellant." (Emphasis added.)

We agree with appellees that the reservation in the Frost deed, on its face, did not give the grantee exclusive leasing rights, but reserved to Frost an undivided one-half of the mineral estate with all the rights inherent in a mineral estate, except only the right to cash bonuses and delay rentals.

The first point of error is overruled.

In support of the alternative plea for reformation, the jury found: (1) That at the time of the purchase of the land by Martin it was agreed between Blakeley, acting for Frost, and Martin that Martin in connection with the mineral reservation contained in the deed should have the exclusive right to execute oil and gas leases on the land; (2) the omission of such right in said deed was a mutual mistake of the parties; (3) Martin did not discover such mistake prior to four years before the law suit was filed; (4) Martin should not have discovered such mistake by ordinary diligence prior to four years before the filing of the suit; (5) Snuggs, prior to the time he purchased the first interest in the land, knew that Martin was claiming the right to lease the entire mineral interest

in said land; (6) by the exercise of reasonable prudence Snuggs should have discovered that Martin was claiming the right to lease the entire mineral interest in said land; (7) the oil and gas lease executed by Martin to Ramsey, which was later assigned to Ashland, was a reasonable and fair lease of said land; (8) at the time Snuggs made his first purchase of interest from the Convention he had knowledge of the facts upon which plaintiffs now seek to reform said deed.

Blakeley testified he was attorney for the Convention and represented it in Texas. He had several conferences with Martin, then a tenant on the land, concerning the purchase of the land. The Convention authorized the sale to Martin. Blakeley represented the Convention and negotiated the sale to Martin. Blakeley prepared the deed. Martin wanted all the mineral rights. Blakeley told him "it was our desire and purpose to retain a part of the royalties." Blakeley explained to Martin "we would be willing for him to have the right of leasing the property for oil and gas, and that he could and would be permissible to receive any bonus that would pay for the lease and receive rentals, but that we desired to retain a half of the royalties. And we ultimately came to that agreement and prepared the deed thereafter for execution." The witness was asked: "You say that you told him that he would have the right to lease the land. Did you mean the entire interest?"; he answered, "Yes sir"; then, "Including the interest that would be reserved to the General Convention?", to which he answered, "That was our agreement." He represented to Martin that the deed gave him the leasing right of all the land in question. The Convention authorized Frost to make the deed in its behalf and receive the consideration. Blakeley also prepared a deed from Frost to the Convention of the reserved mineral rights. Said deed conveyed "all that certain One-half non-participating mineral rights" in and to the property and being the "same mineral rights" reserved in the

Frost to Martin deed. Blakeley told Snuggs in the fall of 1955, before Snuggs bought the first interest from Convention, that Martin had exclusive leasing rights. Blakeley advised the Convention it had no right to make a lease, and recommended it ratify the Ashland lease. The Convention had several hundred pieces of property in Texas in 1943 and Blakeley was in charge of all of them. The witness testified, "we disposed of them." The Convention never sent a representative to Texas; when conferences were desired he met a committee of the Convention in Boston or New York.

Martin testified Blakeley, during negotiations, told him he would hold part of the minerals. Martin told Blakeley that would be satisfactory if he would "let me have all of the leasing rights and non-participating. And that was agreed, and he said it was all right. And I told him to prepare the deed that way. * * * I also was to get all bonuses and delayed rentals, and they was to get non-participating royalty. * * * He said that was agreeable and he would prepare the instrument that way, the deed." When Martin saw Blakeley again, Blakeley told him the deed had been prepared in accordance with the agreement. At the later meeting Blakeley again told Martin he was to have all leasing rights on the property and all bonuses and delay rentals, and if there was any oil ever produced, they (Convention) would have half of the one-eighth. Martin relied on Blakeley's statement that he had prepared the deed in accordance with the agreement. He heard in September, 1955, for the first time that his sole right to lease had been questioned and went to a lawyer immediately.

Charles of Ashland talked with Snuggs in the latter part of 1954 or early 1955, and told Snuggs that Ashland had full interest lease from Martin. After Snuggs bought interest from Convention, Charles asked him if he had always known Martin was to have the leasing rights. Snuggs answered, "Sure, I knew he was supposed to have them, but they didn't do it in their deed."

Snuggs testified he mailed an oil and gas lease to Convention on its remaining interest after he had purchased one-half of Convention's interest; bought remaining Convention's interest after suit was filed, then conveyed it to Cox; arranged orally in August of 1955 with Krehbiel of Convention to purchase one-half of Convention's interest. Krehbiel told him that. Ashland wanted a ratification from Convention. Snuggs testified, "I wasn't interested in what he (Martin) was claiming, because I was buying under a deed, a reservation." Snuggs at first testified he knew at the time he bought the first interest from the Convention a controversy existed about Martin's right to exclusive leasing, because Blakeley had told him so; later he testified Blakeley had not told him of Martin's claim to exclusive leasing rights.

On October 14, 1955, Blakeley wrote Pausch of the Convention a letter, in which Blakeley advised him it was the intention when the Frost deed was executed that Martin have the sole right to lease. A copy was sent to Snuggs.

On October 20, 1955, Pausch of the Convention wrote Snuggs in regard to the lease Snuggs wanted the Convention to execute. Pausch advised Snuggs that the Convention did not feel it had a right to execute a lease. The letter advised Snuggs, "we cannot in good conscience make the lease you offer us."

Snuggs testified he knew about the mineral deed from Frost to Convention, where the interest was described as nonparticipating, before he bought the first interest from the Convention.

We have set out the evidence in more detail than is our wont because in acting on a motion for judgment non obstante veredicto all testimony must be considered in the light most favorable to the party against whom such motion is sought and

conflicts in testimony will be disregarded and every reasonable intendment deducible from the evidence must be indulged in such party's favor.

Viewed in the above light, the evidence, in our opinion, amply supports the findings of the jury and requires a reformation of the Frost-Martin deed.

■ "* * * a mistake in the instrument, consisting in the fact that the parties, or a draftsman employed by them, phrased the instrument in terms inapt to express the actual agreement will support reformation, provided the mistake is embodied in the instrument and was not made subsequent and collateral to it." 36 Tex. Jur., pp. 749–50. In Gilbert v. Smith, 49 S.W.2d 702, 703, 86 A.L.R. 445, the Commission of Appeals approved the rule that " 'against the mistake of both parties, by which, in the effort to reduce the agreement which they had made to writing, they mistake its terms so that the writing does not represent the real contract, equity will grant relief.' " In Hale v. Corbin, Tex.Civ.App., 83 S.W.2d 726, an instrument was reformed so as to show an "overriding royalty interest" rather than a "working interest" as expressed in the instrument. See also Bates v. Lefforge, Tex. Com.App., 63 S.W.2d 360. In Pomeroy's Equity Jurisprudence, 5th Ed., sec. 845, it is said: "if a written instrument fails to express the intention which the parties had in making the contract which it purports to contain, equity will grant its relief, affirmative or defensive, although the failure may have resulted from a mistake as to the legal meaning and operation of the terms or language employed in the writing."

The contract executed failed to express the agreement actually entered into and the mistake was of such nature as to justify and require equitable relief.

■ The judgment of the trial court is reversed; judgment is here rendered reforming the Frost to Martin deed so as to provide that the grantee shall have the exclusive right to make, execute and deliver oil, gas and mineral leases on said land therein described.

Reversed and rendered.